Counsel of Record:
George S. Canellos
Andrew M. Calamari
Celeste A. Chase
Howard A. Fischer
Daniel Michael
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281
(212) 336-0589 (Fischer)
Email:  FischerH@SEC.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
 :
     Plaintiff, :
  -against- :
 :
ERIC J. ARONSON; VINCENT J. BUONAURO, JR.; : COMPLAINT
ROBERT S. KONDRATICK; FREDRIC H. AARON; :
PERMAPAVE INDUSTRIES, LLC; PERMAPAVE : 11 Civ. 7033 (JSR)
USA CORP.; PERMAPAVE DISTRIBUTIONS, INC.; :
PERMEABLE SOLUTIONS, INC.; VERIGREEN, LLC; :
and INTERLINK-US-NETWORK, LTD., : ECF CASE
 :
     Defendants, :
 :
     and :
 :
CAROLINE ARONSON; DEBORAH BUONAURO; :
DASH DEVELOPMENT, LLC; ARON HOLDINGS, :
INC.; PERMAPAVE CONSTRUCTION CORP.; :
DYMONCRETE INDUSTRIES, LLC; DYMON :
ROCK LI, LLC; and LUMI-COAT, INC., :
 :
     Relief Defendants. :
------------------------------------------------------------------------x

   Plaintiff Securities and Exchange Commission (the "SEC") for its Complaint against

defendants Eric Aronson ("Aronson"), Vincent Buonauro ("Buonauro"), Robert Kondratick

("Kondratick"), Fredric Aaron ("Aaron"), PermaPave Industries, LLC ("PermaPave Industries"),

PermaPave USA Corp. ("PermaPave USA"), PermaPave Distributions, Inc. ("PermaPave

Distributions"), Permeable Solutions, Inc. ("Permeable Solutions"), Verigreen, LLC, and

Interlink-US-Network, Ltd. ("Interlink") (collectively, "Defendants"), and relief defendants

defendants Caroline Aronson, Deborah Buonauro, Aron Holdings, Inc. ("Aron Holdings"),

DASH Development, LLC ("DASH"), PermaPave Construction Corp. ("PermaPave

Construction"), Dymoncrete Industries, LLC ("Dymoncrete"), Dymon Rock LI, LLC ("Dymon

Rock"), and Lumi-Coat, Inc. ("Lumi-Coat") (collectively, "Relief Defendants"), alleges as

follows:

## SUMMARY OF ALLEGATIONS

1.      The SEC brings this emergency action to halt an ongoing fraudulent scheme that

has bilked at least 140 investors out of at least $16 million.  Since at least March 2006, Aronson,

his brother-in-law, Kondratick, and Buonauro sold in unregistered offerings promissory notes

and "use of funds agreements" issued by the various PermaPave Entities, a group of related

entities that they owned and controlled.  During these offerings, Aronson, Buonauro, and

Kondratick made misrepresentations and omissions designed to convince investors, most of

whom had little or no prior investment experience, that they were purchasing high-yield

instruments that were free of risk.

2.      Aronson and Buonauro, neither of whom was associated with a registered broker-

dealer at the time, told investors that their money would be used to purchase and ship so-called

PermaPave pavers – permeable paving stones comprised of small rocks glued together – from

Australia for resale in the United States.  According to Aronson and Buonauro, the PermaPave

Entities had a tremendous backlog of confirmed orders for the product, and investors would be

repaid from the profits generated by these guaranteed sales.  Buonauro, who solicited most of the

investors who bought these promissory notes, told prospective investors that the notes were "the

safest investment [they] could ever make."

3.  In reality, there was little demand for the product, and the cost of the few pavers

that were actually purchased by the PermaPave Entities far exceeded the meager revenue

generated from their sales.  Lacking the purported profits that investors were promised, Aronson,

Buonauro, and Kondratick used some of the money derived from new investments to make

"interest" and "profit" payments to earlier investors.  Their ability to make these payments,

however, was short-lived because they used much of the money to fund their lavish lifestyles and

transferred millions of dollars to the Relief Defendants.

4.  When investors began clamoring in late 2008 for payments owed to them,

Aronson told investors that they had no choice but to exchange their notes and agreements for a

convertible debenture that paid interest at a much lower rate and deferred repayment of principal

by two years.  After quieting earlier investors with a promise to repay principal that they would

never fulfill, Aronson and Kondratick continued to raise money by offering and selling

promissory notes and use of funds agreements to new investors on the basis of the same false

representations that the paving stone business would generate considerable profits.

5.  In the summer of 2009, Aronson and Kondratick sought to stop making interest

payments altogether by converting the debentures, notes, and agreements into equity.  To that

end, Aronson told investors that "the company was sold" and urged investors to convert their

investments into shares of Permeable Solutions common stock so that they could reap the

benefits of the sale.  However, there was no sale of the company, and the investors who

converted their investments never received even the worthless shares they were promised.

6.      The fraud did not end at the PermaPave Entities.  On or around June 28, 2010, The Verigreen Group, LLC ("Verigreen Group"), the parent company of several of the PermaPave Entities, became the majority shareholder of Interlink, a publicly-traded company, through a reverse merger.  Several months later, Interlink issued a Form 8-K signed by Kondratick stating that a company named LED Capital Corp. had agreed to invest $6 million in Interlink.  These statements were false because LED Capital Corp. did not have $6 million and never had any dealings, let alone any agreements, with Interlink.

7.      Aaron was an attorney for, and a business advisor to, Aronson and the PermaPave Entities and also was an officer and a director of several of the PermaPave Entities and Interlink. In these roles, Aaron drafted the agreements used to defraud investors, participated in the solicitations conducted by Aronson, repeated during his extensive dealings with investors many of the misleading statements made by Aronson, and developed strategies for concealing the fraud.

8.      As a result of the conduct described in this Complaint, Relief Defendants received ill-gotten gains to which they have no legitimate claim.

9.      By this action, the SEC seeks to terminate this ongoing fraudulent activity, prevent the dissipation of any remaining assets, and compel an accounting of the missing funds.

## SECURITIES LAWS VIOLATIONS

10.     By virtue of the conduct alleged herein:

a.      Defendants, with the exception of Aaron, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a);

b.      Defendants, with the exception of Aaron, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices, and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

c.      Interlink, directly or indirectly, singly or in concert, has engaged and is engaging in acts, practices, and courses of business that constitute violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-11 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-11;

d.      Aronson, Kondratick, and Aaron directly or indirectly, singly or in concert, have, in violation of Section 20(e) of the Exchange Act, 15 U.S.C.A. § 78t(e), engaged and are engaging in acts, practices, and courses of business that have aided and abetted other Defendants' violations of Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20 and 13a-11 thereunder;

e.      Aronson, Buonauro, and Kondratick, as control persons of one or more of the PermaPave Entities under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices, and courses of business that constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5, and Kondratick, as a control person of Interlink under Section 20(a) of the Exchange Act, directly or indirectly, singly or in concert, has engaged and is engaging in acts, practices, and courses of business that constitute violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

f.      The PermaPave Entities, Aronson, and Buonauro, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices, and courses of business

that constitute violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c);

   g. Aronson and Buonauro, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices, and courses of business that constitute violations of Section 15(a) of the Exchange Act, 15 US.C. § 78o(a);

   h. Relief Defendants have obtained ill-gotten proceeds of Defendants' fraudulent conduct that they have no right to retain.

   11. Unless Defendants are temporarily, preliminarily, and permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

   12. The SEC brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 US.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment:  (a) restraining and permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged herein; (b) requiring Defendants, on a joint and several basis, to disgorge the ill-gotten gains they received, if any, as a result of their violations, and to pay prejudgment interest thereon; (c) imposing civil monetary penalties upon the PermPave Entities, Aronson, Buonauro, Kondratick, and Aaron pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); (d) barring Aronson, Kondratick, and Aaron from serving as an officer or director of any publicly-traded company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78(d)(2); (e) barring Aronson, Kondratick, and Aaron from participating in an offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act, 15

U.S.C. § 78u(d)(6); and (f) requiring the Relief Defendants to disgorge any and all ill-gotten

gains they received and to pay prejudgment interest thereon.

### JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to Section 20(b) and 22(a) of

the Securities Act, 15 U.S.C. § 77t(b) and 77v(a), and Sections 21(d), 21(e), and 27 of the

Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

14.    Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), because Defendants transacted business and offered and sold securities in the

Southern District of New York.  Venue is proper pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of business

constituting the violations alleged herein occurred within the Southern District of New York.  A

substantial part of the events and misrepresentations giving rise to the SEC's claims occurred in

this District, including:  (1) at least seven investors were and are residents of this judicial district,

many of whom were solicited in this judicial district and all of whom received materials mailed

by Defendants containing false and misleading statements; (2) a pattern of consistent

communication – by phone and in-person – with these and other investors and prospective

investors in this judicial district through which Defendants conveyed false and misleading

information; (3) the retention of a law firm located in this judicial district that rendered services

in connection with the promissory note and use of funds agreement offerings by the PermaPave

Entities; and (4) the recruitment of a resident of this judicial district to sign a sham agreement

that led to the issuance of a false Form 8-K.

15.    Defendants, directly or indirectly, singly or in concert, have made use of the

means or instruments of transportation or communication in interstate commerce, or of the mails,

in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

16.     **Eric J. Aronson**, age 43, is a resident of Syosset, New York.  He founded PermaPave Industries in October 2006.  From the company's inception to August 2008 and from March 2009 to the present, Aronson has been its owner, Managing Member, and CEO.  From May 2006 to at least January 2009, Aronson was the Chairman of the Board of PermaPave USA, and, since January 2009, he has been its Senior Vice President of Sales and Marketing.   He has also been the principal of Permeable Solutions from when it was established in November 2008 to when it was forced into bankruptcy in January 2011; the sole owner of PermaPave Distributions since it was established in March 2008; the sole owner of PermaPave Construction since it was established in March 2007; a 50% owner of Verigreen, LLC since it was established in May 2008; and the Senior Vice President of Sales and Marketing as well as a de facto officer and director of Interlink from approximately June 2010 to at least February 2011.  Aronson has not been associated with a registered broker-dealer since 1996.  In 2000, Aronson pleaded guilty to charges relating to his lead role in an unrelated offering fraud and was sentenced to a forty-month term of imprisonment.  Also in 2000, the National Association of Securities Dealers ("NASD") barred Aronson from associating with any NASD member firm in any capacity.

17.     **Vincent Buonauro**, age 40, is a resident of West Islip, New York.  From at least December 2006 to March 2009, he was the President and a Member of PermaPave Industries. From August 2008 to March 2009, he was also the Managing Member of PermaPave Industries. Buonauro was never licensed to sell securities.

18.     **Robert Kondratick**, age 41, is a resident of Syosset, New York.  From approximately January 2009 to at least February 2011, Kondratick was the President, COO, and Chairman of the Board of PermaPave USA.  From approximately November 2008 to at least January 2011, Kondratick was the President and a director of Permeable Solutions.  He was also the Manager and a 99% owner of Verigreen Group since it was established in December 2009.  From June 2010 to February 2011, Kondratick was also the President and Chairman of the Board of Directors of Interlink.

19.     **Fredric Aaron**, age 47, is a resident of Port Washington, New York.  He has been a member of the bar of the state of New York since 1990.  Aaron was an attorney for Aronson and the PermaPave Entities from approximately November 2008 to at least February 2011.  From approximately November 2008 to at least January 2011, Aaron was the Secretary and a director of Permeable Solutions.  From June 2010 to February 2011, Aaron was also the Secretary and a director of Interlink.  He has also been a 1% owner of Verigreen Group since it was established in December 2009.

20.     **PermaPave Industries, LLC** is a New York corporation, with its last known principal place of business at 575 Underhill Boulevard, Suite 125, Syosset, NY 11791 (the "Syosset Office").  PermaPave Industries was the issuer of some of the promissory notes and use of funds agreements sold in the fraudulent scheme.

21.     **PermaPave USA Corp.** is a New York corporation, with its last known principal place of business at the Syosset Office.  PermaPave USA is the issuer of some of the promissory notes and use of funds agreements sold in the fraudulent scheme.  The company was dissolved on or about April 27, 2011.

22.     **PermaPave Distributions, Inc.** is a New York corporation, with its last known

principal place of business at the Syosset Office.  PermaPave Distributions was the issuer of

some of the promissory notes sold in the fraudulent scheme.

23.     **Permeable Solutions, Inc.** is a Nevada corporation, with its last known principal

place of business at the Syosset Office.  Permeable Solutions issued some of the promissory

notes and all of the convertible debentures sold in the fraudulent scheme.  On January 11, 2011,

investor-creditors of Permeable Solutions filed a Chapter 7 involuntary petition for bankruptcy in

the United States Bankruptcy Court for the Eastern District of New York.

24.     **Verigreen, LLC** is a Delaware corporation, with its last known principal place of

business at the Syosset Office.  Verigreen, LLC issued some of the promissory notes sold in the

fraudulent scheme.

25.     **Interlink-US-Network, Ltd.** is a California corporation, with its last known

principal place of business at 10390 Wilshire Boulevard, Penthouse 20, Los Angeles, CA 90024.

Interlink files periodic reports, including Forms 10-Q and 10-K, with the SEC, and its common

stock is registered with the SEC pursuant to Section 12(g) of the Exchange Act.

## RELIEF DEFENDANTS

26.     **Caroline Aronson**, age 40, is a resident of Syosset, New York and is Aronson's

wife.  Some investor funds were transferred to a bank account held by her.  The house in which

she and Aronson reside, which is located at 52 Stratford Place, Syosset, New York 11791, is in

her name.  For several years, the monthly mortgage payments for this house have come from

accounts containing investor funds.

27.      **Deborah Buonauro**, age 40, is a resident of West Islip, New York and is

Buonauro's wife.  She and Buonauro jointly own a house located at 114 Chris Lane, West Islip,

New York 11795, the down payment and multiple monthly mortgage payments for which came from an account containing investor funds.

28.     **DASH Development, LLC** ("DASH") is a New York corporation, with its last known principal place of business at 30 Executive Plaza, Jericho, New York 11753.  Aronson founded DASH, through which he promoted his self-help book of the same name and through which he sold products and coaching services relating to this book.  Some investor funds were deposited into or transferred to a bank account held by DASH.

29.     **Aron Holdings, Inc.** ("Aron Holdings") is a New York corporation, with its last known principal place of business at 30 Executive Plaza, Jericho, New York 11753.  Aronson owns Aron Holdings, and the company appears to have no operations.  Some investor funds were deposited into or transferred to a bank account held by Aron Holdings.  The company was dissolved on or about April 27, 2011.

30.     **PermaPave Construction Corp.** ("PermaPave Construction") is a New York corporation, with its last known principal place of business at the Syosset Office.  Some investor funds were deposited into a bank account held by PermaPave Construction.

31.     **Dymoncrete Industries, LLC** ("Dymoncrete") is a New York corporation, with its last known principal place of business at the Syosset Office.  Some investor funds were transferred to a bank account held by Dymoncrete.

32.     **Lumi-Coat, Inc.** ("Lumi-Coat") is a New York corporation, with its last known principal place of business at the Syosset Office.  Some investor funds were transferred to a bank account held by Lumi-Coat.

33.   **Dymon Rock LI, LLC** ("Dymon Rock") is a New York corporation, with its last known principal place of business at the Syosset Office.  Some investor funds were deposited into a bank account held by Dymon Rock.

## OTHER RELEVENT PERSONS AND ENTITIES

34.   **The Verigreen Group, LLC** is a Nevada corporation, with its last known principal place of business at the Syosset Office.  Verigreen Group is the parent company of Permeable Solutions, PermaPave USA, Dymoncrete, Dymon Rock, and Lumi-Coat.  On or about June 28, 2010, Verigreen Group acquired 72% of all outstanding shares of Interlink common stock.

35.   **Associate No. 1**, age 64, is a resident of New York, New York and is a long-time associate of Aronson's.  Associate No. 1 purported to be the President of LED Capital Corp., a company with which he had no affiliation, and in that capacity signed a memorandum of understanding with Interlink.

## FACTS

**A.    Invocations of the Fifth Amendment Privilege**

36.   Prior to the filing of this Complaint, the SEC conducted a formal investigation of the violations alleged herein.  Aronson, Buonauro, Kondratick, and Aaron appeared for testimony in response to subpoenas issued by the Commission in connection with this investigation.  Each of these individuals invoked his Fifth Amendment privilege against self-incrimination in response to virtually every question posed by the SEC staff concerning the facts herein alleged.

**B.      Background**

37.      Following his release from prison for a leading role in an unrelated offering fraud,

Aronson, in October 2006, founded PermaPave Industries, appointed himself as its CEO, hired

as its President Buonauro, who previously worked in the landscaping business and had no prior

experience with selling securities, and subsequently recruited his brother-in-law, Kondratick, as

well as an attorney, Aaron.  Aronson, Kondratick, and Aaron then created the other PermaPave

Entities for the purposes of both furthering and concealing the fraud they began committing

through their offering of securities issued by PermaPave Industries.

38.      The PermaPave Entities operated from the same offices, shared the same

employees, commingled assets, and purported to sell PermaPave pavers, which are squares

comprised of small rocks glued together that purportedly assist with storm drainage.

39.      The PermaPave Entities have never been profitable.  Sales of PermaPave products

have been negligible, and such sales activity has been conducted at a substantial loss.  The

PermaPave Entities' affiliates, including Relief Defendants PermaPave Construction,

Dymoncrete, Lumi-Coat, and Dymon Rock, were and remain similarly unprofitable.

**C.      The Promissory Note and Use of Funds Agreement Offering**

40.      From on or about 2006 to at least 2010, Aronson, Buonauro, and others offered

and sold to approximately 140 investors $26 million worth of securities fashioned as promissory

notes and "use of funds" agreements issued by various PermaPave Entities.  The interest rates on

the notes and agreements varied; however, most provided for monthly rates of return from 7.8%

to 33.3%, the equivalent of annual rates of return of approximately 94% to 400%.  Buonauro

solicited at least 80 of the 140 investors from approximately 2006 to 2008, and Aronson solicited

at least 30 of these investors from approximately 2006 to 2010.  Aronson and Buonauro targeted

families with little or no investment experience.

41.     Aronson and Buonauro, neither of whom at the time was associated with a registered broker-dealer, made the following oral statements to prospective purchasers of the promissory notes and use of funds agreements:

      a.    There was a tremendous demand – indeed, a huge backlog of confirmed purchase orders – for the PermaPave pavers.  When soliciting investors, Aronson stated that the PermaPave Entities had received confirmed purchase orders for "millions and millions of square feet" of product.

      b.    The proceeds raised through the sale of these securities were to be used exclusively to finance the purchase and shipment of PermaPave pavers from manufacturers in Australia.

      c.    Investors would be repaid from the profits generated from sales that were guaranteed by the tremendous backlog of confirmed orders.

      d.    If the PermaPave Entities did not use any portion of the money invested for the purchase of pavers, the entities would return that portion to investors.

      e.    Consequently, the promissory notes and use of funds agreement were extremely low risk investments.  Buonauro described the notes to several investors as "the safest investment [they] could ever make."

42.     These statements were false and misleading because:

      a.    At the time these representations were made, there was virtually no demand for the product and there was no backlog of confirmed orders for "millions and millions of square feet" of PermaPave pavers or even a tenth

of that amount.

b.  Although approximately $25 million of the more than $26 million raised

through the sale of these notes and agreements was to be used exclusively

for the purported purpose of financing the purchase of PermaPave

products, only approximately $600,000 was, in fact, used to purchase

pavers.

c.  There were no profits generated from the sale of these products.  On

information and belief, the total revenue recognized from actual sales of

the product was approximately $200,000, i.e., approximately one third of

the wholesale cost of the pavers.  Lacking the profits from which investors

were told they would be repaid, the PermaPave Entities used investments

made by newer investors to make payments totaling approximately $10

million to earlier investors.

d.  Aronson, Buonauro, and Kondratick misappropriated approximately $11

million raised through these notes and agreements for their own personal

use or for the benefit of the Relief Defendants, while using another

approximately $10 million to meet principal and interest payments due to

investors.

e.  There was a tremendously high risk associated with these investments.

43.  The use of funds agreements repeated many of the false and misleading

statements that Aronson and Buonauro made orally.  For example, they stated:  "[i]t is expressly

understood that the [investor's] funding may be used by the Company for the purchase of

containers of Permapave pavers only"; "[t]he Company acknowledges that . . . it has confirmed

orders for resale"; "[t]he Gross Profit shall be shared on an equal 50%/50% basis between" the

investor and the PermaPave Entity issuing the agreement and that payment "shall be made within

thirty (10) [sic] days after the containers . . . have landed at port and sold to end users"; and "[i]n

the event that the Company is unable to secure orders within thirty days of this Agreement,

Company [sic] shall immediately return all of the advanced funds to Funder."

44.     Aronson, Buonauro, and Kondratick signed the promissory notes.  Aronson and

Kondratick signed the use of funds agreements.  Aside from the promissory notes and use of

funds agreements themselves, no financial reports or other written financial information was

provided to investors in connection with the sale of the notes or agreements.

45.     Aronson, Buonauro, and Kondratick knew or were reckless in not knowing that

the statements made to investors were false and misleading.

46.     Kondratick coordinated the limited number of shipments of PermaPave product

from Australia and therefore knew or was reckless in not knowing that most of the millions of

dollars being raised from investors were not being used to purchase product.

47.     Aronson was heavily involved in attempts to sell PermaPave products and knew

that these attempts were largely unsuccessful.  Accordingly, Aronson knew or was reckless in

not knowing that representations he and the other Defendants were making to investors about the

demand for, and profitability of, the pavers were false.

48.     Buonauro also knew or was reckless in not knowing that these representations

were false because he controlled several PermaPave Entity bank accounts, all of which had

minimal activity related to the sale of products.  Despite their familiarity with the meager sales

activity of the PermaPave Entities, Aronson, Buonauro, and Kondratick sold promissory notes

and use of funds agreements with extraordinarily high interest rates that could only be repaid

through the recruitment of new investors.

49.     Aronson, Buonauro, and Kondratick were each signatories on the PermaPave Entities' bank accounts into which investor money was deposited, and each of them wrote hundreds of checks directing that the funds collected be paid to themselves as well as to previous investors rather than used for the purchase of product for resale.  Specifically, they made Ponzi-type payments to earlier investors totaling approximately $10 million, misappropriated at least $6 million, and transferred approximately $5 million to Relief Defendants.

50.     Aronson, Buonauro, and Kondratick made or directed transfers from accounts containing investor funds of (i) at least $1.4 million in payments to Aronson, (ii) at least $853,000 to Buonauro, (iii) at least $280,000 to Kondratick, and (iv) at least $294,000 to Aaron. In addition, Aronson, Kondratick, and Buonauoro used investor funds to pay over $3 million in personal expenses relating to their home mortgages, luxury cars, clothes, gambling trips to Las Vegas and other vacations, jewelry, and bills incurred at "gentlemen's clubs."  They also made cash withdrawals totaling approximately $453,000 from these accounts.  In addition, Buonauro withdrew $275,000 from an account that contained investor funds and then applied that amount toward a down payment on a house that he and Deborah Bounauro jointly own.

51.     In addition to these amounts, Aronson misappropriated approximately $2.6 million through Aron Holdings and DASH, companies he solely owned and controlled, by:  (i) depositing into their bank accounts checks written by investors that were supposed to be used for the exclusive purpose of purchasing PermaPave products for resale; (ii) transferring funds to their accounts from other accounts containing investor funds; and (iii) transferring approximately $1.6 million from accounts containing investor funds to two Australian companies, PermaPave Worldwide Pty, Ltd. and Dymon Industries Pty, Ltd., and to their principals, which money they

then re-routed back to Aronson through wire transfers to Aron Holdings and DASH.  Aronson

used the investor funds deposited into or transferred to the Aron Holdings account to make

payments totaling at least $319,000 to his wife, Caroline Aronson.  He also used the Aron

Holdings account to pay for various personal expenses, including monthly mortgage payments of

over $8,000 and monthly court-ordered restitution payments to victims of the scheme to which

he pleaded guilty to conducting in 2000.

52.     PermaPave Entities' affiliates PermaPave Construction, Dymoncrete, and Lumi-

Coat received approximately $116,000, $1.7 million, and $7,500, respectively, in the form of

transfers from accounts containing investor funds.

**D.     The Convertible Debenture Offering**

53.     Despite the high interest rates stated in the promissory notes and use of funds

agreements, the PermaPave Entities generally made only a few initial interest payments to

investors.

54.     Buonauro left, or was forced by Aronson to leave, the PermaPave Entities in early

2009.  Also around this time, investors began clamoring for payment.  In order to prevent the

fraudulent scheme from collapsing, and to keep angry investors at bay, Aronson and Aaron

concocted a new type of investment into which these investors' initial investments would be

rolled.

55.     Beginning in December 2008, Aronson and Aaron told investors who were

demanding payment that they would be repaid only if they assigned their promissory notes and

use of funds agreements to a new entity that Aronson and Aaron created, Permeable Solutions, in

exchange for a convertible debenture issued by Permeable Solutions.  These debentures paid a

much lower interest rate than the notes and agreements and deferred the repayment of principal

by two years.

56.     Aaron, who in addition to working as an attorney for the PermaPave Entities was also the Secretary and a director of Permeable Solutions, sent two letters to investors describing Aronson's offer, including the key terms of the convertible debenture.

57.     Aronson told investors that exchanging their promissory notes and use of funds agreements for convertible debentures was their only choice because:

> a.    The interest rates on the notes and agreements were usurious, and investors had committed a "class C felony" by signing them for which Aronson could have had them arrested.

> b.    The debentures would be secured by an escrow account that the PermaPave Entities would fund to repay the debentures when they matured.

> c.    Remarkably, Aronson claimed that he had no knowledge of these notes and agreements until after the fact, and therefore was not responsible for any of them, but he nonetheless was willing to exchange them for debentures as a gesture of goodwill.

58.     These statements were false and misleading because:

> a.    Under New York law, usury laws are inapplicable when the borrower is a corporation.

> b.    No escrow account was ever funded for the repayment of the debentures, nor could one be given that Defendants conducted the business operations of the PermaPave Entities at a substantial loss, and those entities did not have the wherewithal to fund an escrow account.

    c.    Aronson was aware of many, if not all, of the notes and agreements while they were being issued because he offered and sold many of them, controlled the bank accounts into which investor proceeds were deposited, was involved in many internal correspondences regarding the status of the outstanding notes and agreements, and more than anyone else misappropriated the funds raised through the sale of these notes and agreements.  And, most importantly, Aronson's supposed goodwill gesture was really an attempt to conceal the very material fact that the PermaPave Entities misused the investors' initial investments and therefore lacked the funds to pay off the notes and agreements.

59.    Aaron participated in many of the group solicitation meetings in which Aronson made these misstatements.  At these meetings, Aaron was introduced as a "former SEC lawyer" by either Aronson or Aaron himself.  After being so introduced, Aaron confirmed that several of the misstatements made by Aronson, such as those concerning the escrow account and Aronson's lack of responsibility for outstanding debts to investors, were correct both factually and legally.

60.    After these solicitations, Aaron served as the contact person for investors who had questions concerning the debentures.  In this role, he persuaded many investors who had become leery of Aronson that the debentures were a legitimate and promising investment.  He did this by, among other methods, making misstatements and omissions concerning the purportedly usurious interest rates of the promissory notes and use of funds agreement, the purported escrow account that would be funded to repay the debentures, Aronson's purported lack of responsibility for any of the promissory notes or use of funds agreements issued, and by misrepresenting the existence or status of negotiations for the sale of the PermaPave Entities.

61.     Approximately 80 investors exchanged notes or agreements, with a collective face amount of approximately $4.7 million, for convertible debentures.  The face amount of the debentures represented the unpaid principal and accrued interest owed on the exchanged note or agreement.  The collective face amount of these debentures was approximately $11.5 million. The debenture agreements, which were executed in or around January 2009, paid interest at a rate of 1% per month and purportedly provided the investors the right to convert the debentures into shares of Permeable Solutions common stock on a 1:1 dollar for share basis.

62.     Investors were not given any written materials aside from the debenture agreement itself and another agreement assigning the investors' promissory note or use of funds agreement to Permeable Solutions.  These agreements, which were drafted by Aaron and signed by Kondratick and Aronson, state that the face amount "and all accrued but unpaid interest . . . shall be fully due and payable on January 15, 2011," or earlier if Permeable Solutions "closes on a reverse-merger with a public corporation" or conducts an initial public offering. These agreements identified no risk factors and failed to disclose that Permeable Solutions had no ability to pay investors without new investor funds coming in, or that new investments would be used to pay the debenture holders' interest and principal.

63.     Aronson knew or was reckless in not knowing that the misstatements and omissions made during solicitations were false and misleading, and he and Kondratick also knew or were reckless in not knowing that the misstatements and omissions contained in the debenture agreements were false and misleading.  Because they knew that the PermaPave Entities' revenue from the sale of products was miniscule and outweighed by the cost of obtaining these products, and because they both controlled the bank accounts of the PermaPave Entities, they knew or were reckless in not knowing that Permeable Solutions lacked the ability to set aside funds to

repay the approximately $11.5 million owed to debenture holders.  Also, given that Aronson

employed at the time at least three attorneys licensed to practice in New York, he either knew or

was reckless in not knowing that his statement on the state's usury laws was false.

64.     Aaron also knew or was reckless in not knowing that the statements made to

investors were false and misleading.  Aronson and Kondratick, and others told Aaron that the

PermaPave Entities lacked the funds necessary to repay holders of promissory notes and use of

funds agreements and together Aronson, Kondratick and Aaron devised a strategy to address this

problem.  Because Aaron knew that the PermaPave Entities could not repay notes and

agreements with a collective face value of $4.7 million, he clearly also knew that they could not

repay debentures that had a collective face value of at least $11.5 million and that also paid 12%

interest annually on this amount.  Aaron nevertheless assisted Aronson during the debenture

offering, and at no point did he perform any due diligence on the issuer's clearly doubtful ability

to fund an escrow account for their repayment.  In addition, Aaron knew or was reckless in not

knowing that it was improper for Aronson to coerce investors into surrendering their notes and

agreements by accusing them of committing a "class C felony" but nevertheless participated in

meetings in which Aronson made this accusation, and he also dealt directly with investors who

asked him questions concerning this misstatement as well as others.  And, as the company's

corporate attorney who was involved in many fruitless attempts to sell the PermaPave Entities,

Aaron also knew or was reckless in not knowing that none of the PermaPave Entities were about

to be sold in a multi-million dollar deal, but he nevertheless frequently conveyed this news to

prospective investors in the debentures.

**E.     The Conversion of Existing Investments into Stock**

65.     Permeable Solutions only made initial interest payments on the debentures.  By

the summer of 2009, debenture holders as well as investors who still held promissory notes and use of funds agreements were again demanding payment.

66.     In response, Aronson, Aaron, and a PermaPave Entities employee acting pursuant to Aaron's instructions told investors that "the company was sold" or was about to be sold and urged investors to convert their debentures, promissory notes, or use of funds agreements into Permeable Solutions stock so that they could reap the benefits of this sale.

67.     This statement was false and misleading because none of the PermaPave Entities had been sold or were about to be sold.  While there were preliminary negotiations with a broker who claimed that he could find a buyer for the PermaPave Entities, these negotiations never progressed in any meaningful fashion due to, among other things, the PermaPave Entities' failure to satisfy most of the broker's prerequisites for his involvement, including the provision of audited financial statements and the verification of manufacturing facilities and agreements, both of which did not exist.

68.     Approximately 53 investors converted their investments into what they were told were shares of Permeable Solutions' common stock.  Kondratick signed the conversion agreements on behalf of Permeable Solutions.  This agreement referenced the purported sale of Permeable Solutions to a third party and failed to identify any risk factors.

69.     None of the investors who signed these agreements received the shares of Permeable Solutions common stock promised to them.

70.     On or around June 28, 2010, Verigreen Group, the parent of Permeable Solutions, PermaPave USA, and PermaPave Industries, became the majority shareholder of Interlink, a publicly-traded company, through a reverse merger.  Interlink purported to manufacture and sell an electronic device that linked a customer's television to data services; however, the company

had no revenue from sales.  Under the terms of the reverse merger, Kondratick became the

President and Chairman of the Board of Interlink, and Aaron became its Secretary and a director.

71.     In September 2010, a letter signed by "Permeable Solutions Management" was

sent to investors who signed conversion agreements informing them that the number of shares

owed to them had been drastically reduced, or "recalculated," and that they would receive

Interlink common stock, not Permeable Solutions common stock as required by the conversion

agreements.  The September letter further advised investors that they would receive Interlink

common stock based upon "a valuation of five shares of Permeable Solutions for one share of

Interlink."  To receive these shares, which were worth a fraction of the investors' original

investment, Permeable Solutions required investors to sign a release absolving the PermaPave

Entities and individuals affiliated with the PermaPave Entities of all criminal and civil liability.

72.     Approximately half of the investors who were owed shares of Permeable

Solutions stock received shares of Interlink common stock, which were worth a fraction of their

original investment.

**F.     The PermaPave Entities' Offerings Were Not Registered**

73.     None of the PermaPave Entities registered their offerings of promissory notes, use

of funds agreements, debentures, or common stock with the SEC at any time.

74.     Defendants never collected any information on the annual income or net worth of

the investors they solicited.  For each of the promissory note, use of funds agreement, debenture,

and Permeable Solutions stock offering, many, if not most, of the prospective investors solicited

were not accredited investors.  In fact, many did not even have assets sufficient to purchase the

securities offered by the PermaPave Entities and drew on home equity lines and/or obtained

credit card advances to purchase them.  Aronson, Buonauro, and Aaron were aware of this, and

Aronson even persuaded at least one investor to borrow against the equity in her home.

75.     Investors solicited did not receive any offering materials other than the agreements they signed.

### G.     Misstatements in Interlink's Public Filings

76.     Aronson negotiated the reverse merger with Interlink on behalf of Verigreen Group and afterwards assumed the title of Senior Vice President of Sales and Marketing at Interlink.  He also acted as a de facto officer and director by, among other things, attending and participating in board meetings, paying the salaries of Interlink officers and directors from accounts over which he exercised ultimate authority, deciding which of the company's bills should be paid, holding final authority on significant business decisions such as who should sign filings with the SEC and whether lawsuits should be settled, and leading attempts to raise funds through the sale or loan of large blocks of Interlink shares.  Although Interlink issued a Form 8-K on July 13, 2010 identifying the individuals who were recently appointed to manage the company, Aronson's official title and his role as a de facto officer and director was never disclosed in any public filing.

77.     In October 2010, investors who had initiated a lawsuit against several of the PermaPave Entities and Aronson obtained an order freezing the bank accounts of the PermaPave Entities.  In an effort to persuade these investors to release the restraints on these bank accounts, Aronson and Aaron told the investors' attorney that Interlink was finalizing a deal with a company called LED Capital Corp. that would provide the PermaPave Entities with funds sufficient to repay the investors he represented.

78.     Aronson recruited one of his long-time associates, Associate No. 1, to act as the President of LED Capital Corp.  Associate No. 1 has never held a position at, or had any interest

in, LED Capital Corp.

79.     Aronson and Aaron set up a conference call between themselves, the investors'
attorney, and Associate No. 1.  During this call, Associate No. 1 confirmed he intended to invest
millions of dollars in Interlink.  After the call, the investors' attorney stated that he would not
release the restraints on the accounts unless and until he received a written assurance that the
investors he represented would be repaid through this transaction.

80.     On or about October 20, 2010, Kondratick signed a purported agreement, which
was drafted by Aaron, on behalf of Interlink, and Associate No. 1 signed as President of LED
Capital Corp.  The agreement stated that LED Capital Corp. would purchase 1.2 million shares
of Interlink, which at the time were worth approximately $1.1 million (based on the Over the
Counter Bulletin Board market price for Interlink shares), for $6 million.  The agreement further
provided that $1.8 million of the purchase amount would be deposited into the escrow account of
an attorney representing the investors who had obtained the freeze order.  After Aaron obtained
the signatures of Kondratick and Associate No. 1 on the agreement, he forwarded a copy of the
agreement to the investors' attorney in an effort to persuade him to release the restraints on the
PermaPave Entities' accounts.

81.     Approximately two months later, on December 14, 2010, Interlink issued a Form
8-K signed by Kondratick.  The Form 8-K stated that Interlink and LED Capital Corp. had
entered into a Memorandum of Understanding whereby LED Capital Corp. intended to invest $6
million in Interlink.

82.     Kondratick, Aronson, and Aaron reviewed drafts of the Form 8-K before it was
issued.

83.     On February 28, 2011, the principal of LED Capital Corp. sent a letter to the SEC

staff which stated:

> I am the sole officer-stockholder of LED Capital Corp.  No other person has any authority or permission to act on behalf of the company.  LED Capital Corp. has never had any contact, correspondence or communication with Interlink or PermaPave Industries.  No transactions were contemplated between LED Capital and Interlink. . . . I looked up Interlink on the internet and saw the letter [i.e., the memorandum of understanding] you referred to.  That funding letter from LED is a complete fraud.  I never had any knowledge of it before your call.

84.     On March 28, 2011, the principal of LED Capital Corp. testified in connection with the SEC's investigation, during which he repeated the assertions contained in his February 28, 2011 letter.  He further testified that Associate No. 1 had "absolutely no[]" authority to act on behalf of his company and that his company "never had [and] probably never will have" $6 million available to it.

85.     Kondratick knew or was reckless in not knowing that the information contained in the Form 8-K was false and misleading.  Kondratick was the President and Chairman of the Board of Interlink and, in those capacities, participated in board meetings and was involved in the day-to-day operations of the company.  In these roles, he saw that no steps had been taken to consummate that agreement at any point in the two months between his signing of the purported agreement and the issuance of the Form 8-K.  Even if Kondratick somehow did not know that Aronson's long-time friend, Associate No. 1, had no authority to act on behalf of LED Capital Corp., Kondratick was reckless in failing to make any attempt to verify the role of Associate No. 1 at LED Capital Corp.

86.     Kondratick also possessed a motive for issuing this false press release.  Investors had frozen the accounts of the PermaPave Entities containing investor funds from which Kondratick frequently wrote checks to himself.  These investors agreed to unfreeze the accounts upon receiving confirmation of the purported $6 million investment.  Kondratick's signing of the

Form 8-K was one of the methods through which he sought to confirm the fictitious investment and induce reliance on the fake agreement.  He also kept news of this purported agreement from other board members, who would question an investment that was equivalent to over 2000% of the company's existing assets and would seek to verify this remarkable news.

87.     Aaron also knew or was reckless in not knowing that the information contained in the Form 8-K was false and misleading for many of the same reasons.  He, like Kondratick, was an officer and director of the company, participated in board meetings, and was involved in the company's daily operations.  Like Kondratick, Aaron kept the news of the purported agreement from directors who would question it, and he stood to benefit personally if the investors who had frozen the accounts from which he was paid were induced to release those restraints.  In addition, Aaron performed due diligence on other prospective institutional investors but failed to perform any on LED Capital Corp., its assets, or Associate No. 1.  Given that Associate No. 1 agreed to pay $6 million for shares worth approximately $1.1 million, this failure was clearly reckless.

88.     Aronson also knew or was reckless in not knowing that the information contained in the Form 8-K was false and misleading.  Aronson knew Associate No. 1 for many years and during this period was aware of the business activities of Associate No. 1.  He also routinely participated in board meetings but failed to disclose this purported transaction to the directors who were not involved in it.  Aronson also had a very strong motive in eliminating the restraints on the accounts that temporarily suspended his habitual misappropriations of investor money.

89.     On December 18, 2010, Associate No. 1, purportedly on behalf of LED Capital Corp., and Aaron, on behalf of Interlink, agreed to cancel the agreement between their respective companies.  No public statement was ever issued disclosing this cancellation or otherwise correcting the information disclosed four days prior in the Form 8-K.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

### (as to Aronson, Buonauro, Kondratick, the PermaPave Entities, and Interlink,)

90.     The SEC realleges and incorporates paragraphs 1 through 89 by reference as if fully set forth herein.

91.     The promissory notes and use of funds agreements issued by the PermaPave Entities, the convertible debentures and the shares of common stock issued by Permeable Solutions, and the shares of common stock issued by Interlink are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

92.     Aronson, Buonauro, Kondratick, the PermaPave Entities, and Interlink directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:

      a.     Employed devices, schemes, or artifices to defraud;

      b.     Obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or

      c.     Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93.     By reason of the foregoing, these Defendants, singly or in concert, directly or indirectly, have violated, are violating, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(as to Aronson, Buonauro, Kondratick, the PermaPave Entities, and Interlink)**

94.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if fully set forth herein.

95.    Aronson, Buonauro, Kondratick, the PermaPave Entities, and Interlink directly or indirectly, singly or in concert, in connection with the purchase and sale of securities by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange:

      a.    have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud;

      b.    have made, are making, or are about to make untrue statements of material fact, or have omitted, are omitting, or are about to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

      c.    have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon other persons.

96.    By reason of the foregoing, these Defendants, singly or in concert, directly or indirectly, have violated, are violating, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder**

#### (as to Aronson, Kondratick, and Aaron)

97.     The SEC realleges and incorporates paragraphs 1 through 89 by reference as if

fully set forth herein.

98.     By reason of the foregoing and Section 20(e) of the Exchange Act, 15 U.S.C.

§ 78t(e), Aronson, and Kondratick, and Aaron aided and abetted violations of, and unless

enjoined will continue to aid and abet violations of, Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule l0b-5 thereunder, 17 C.F.R. § 240.10b-5.

### FOURTH CLAIM FOR RELIEF

**Control Person Liability under Section 20(a) of the Exchange Act for Violations
of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

#### (as to Aronson, Buonauro, and Kondratick)

99.     The SEC realleges and incorporates paragraphs 1 through 89 by reference as if

fully set forth herein.

100.    Aronson is, or was, directly or indirectly, a control person of the PermaPave

Entities for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

101.    Buonauro is, or was, directly or indirectly, a control person of PermaPave

Industries for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

102.    Kondratick is, or was, directly or indirectly, a control person of Permeable

Solutions, PermaPave USA, and Interlink for purposes of Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a).

103.    As control persons of one or more of the PermaPave Entities or Interlink,

Aronson, Buonauro, and Kondratick are jointly and severally liable with and to the same extent as the controlled entity for its or their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FIFTH CLAIM FOR RELIEF

**Violation of Section 13(a) of the Exchange Act and
Rules 12b-20 and 13a-11 Thereunder**

**(as to Interlink)**

104.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if fully set forth herein.

105.    At all relevant times, Interlink was a reporting company and subject to the provisions of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a).

106.    Interlink directly or indirectly, singly or in concert:

a.    failed to include in a statement or report filed with the SEC, in addition to the information expressly required to be included in such statement or report, further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading; or

b.    failed to file a current report on Form 8-K within the period specified in that form unless substantially the same information as that required by Form 8-K has been previously reported by the registrant.

107.    By reason of the foregoing, Interlink, singly or in concert, directly or indirectly, has violated, is violating, and unless enjoined will again violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-11 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-11.

## SIXTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act
and Rules 12b-20 and 13a-11 Thereunder**

**(as to Kondratick, Aronson, and Aaron)**

108.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if

fully set forth herein.

109.    By reason of the foregoing, Kondratick, Aronson, and Aaron aided and abetted

violations by Interlink of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11

thereunder.

## SEVENTH CLAIM FOR RELIEF

**Control Person Liability under Section 20(a) of the Exchange Act for Violations
of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 Thereunder**

**(as to Kondratick)**

110.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if

fully set forth herein.

111.    Kondratick is, or was, directly or indirectly, a control person of Interlink for

purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

112.    As a control person of Interlink, Kondratick is jointly and severally liable with

and to the same extent as Interlink for its violations of Section 13(a) of the Exchange Act and

Rules 12b-20 and 13a-11 thereunder.

## EIGHTH CLAIM FOR RELIEF

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(as to the PermaPave Entities, Aronson, and Buonauro)**

113.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if

fully set forth herein.

114.    The PermaPave Entities, Aronson, and Buonauro, directly or indirectly, singly or in concert, offered and sold to investors, promissory notes, use of funds agreements, convertible debentures, and/or the shares of common stock issued by the PermaPave Entities when no registration statement was filed with the SEC or was in effect as to such securities.

115.    In offering and selling these securities, the PermaPave Entities, Aronson, and Buonauro, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or have carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was applicable.

116.    By reason of the foregoing, the PermaPave Entities, Aronson, and Buonauro have violated and are violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## NINTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

### (as to Aronson and Buonauro)

117.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if fully set forth herein.

118.    Aronson and Buonauro, by use of the mails or the means or instrumentalities of interstate commerce, while acting as brokers and while engaged in the business of effecting

transactions in securities for the accounts of others otherwise than through a national securities exchange, effected transactions in, or induced or attempted to induce the purchase or sale of securities (other than an exempted security or commercial paper, banker's acceptance, or commercial bills) without registering as a broker or dealer in accordance with Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

119.    By reason of the foregoing, Aronson and Buonauro have violated and are violating Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## TENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Relief Defendants)

120.    The SEC realleges and incorporates paragraphs 1 through 89 by reference as if fully set forth herein.

121.    Relief Defendants each received, directly or indirectly, funds and/or other assets that either were, or are traceable to, the proceeds of the fraudulent and illegal sales of securities alleged above.  Each of the Relief Defendants profited from such receipt or from the fraudulent and illegal sales of securities alleged above by obtaining illegal proceeds under circumstances in which it is not just, equitable, or conscionable for them to retain the illegal proceeds. Consequently, each of them has been named as a Relief Defendant for the amount of proceeds by which each has been unjustly enriched as a result of the fraudulent scheme or illegal sales transactions.

122.    By reason of the foregoing, Relief Defendants should disgorge their ill-gotten gains, plus prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that the Court grant the following relief:

### I.

An Order permanently restraining and enjoining:

(1)   Aronson, Buonauro, Kondratick, the PermaPave Entities, and Interlink from future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a).

(2)   Defendants from future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.l0b-5;

(3)   Interlink, Kondratick, Aronson, and Aaron from future violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-11 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-11;

(4)   The PermaPave Entities, Aronson, and Buonauro from future violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); and

(5)   Aronson and Buonauro from future violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### II.

An Order barring Aronson, Kondratick, and Aaron from serving as an officer or director of any publicly-traded company pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

### III.

An Order pursuant Section 20(g) of the Securities Act, 15 U.S.C.A. § 77t(g), and Section

21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Aronson, Kondratick, and Aaron

from directly or indirectly participating in an offering of penny stock, as defined by Rule 3a51-1

under the Exchange Act, 17 C.F.R. § 240.3a51-1.

## IV.

An Order directing the PermaPave Entities, Aronson, Buonauro, Kondratick, Aaron, and

the Relief Defendants to disgorge their ill-gotten gains, plus prejudgment interest, and such other

and further amount as the Court may find appropriate.

## V.

An Order directing the PermaPave Entities, Aronson, Buonauro, Kondratick, and Aaron

to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d),

and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Such other and further relief as this Court deems just and proper.

Dated:  October 6, 2011
        New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
        George S. Canellos

Regional Director
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281
(212) 336-0589 (Fischer)
Email:  FischerH@SEC.gov

Of Counsel:

Andrew M. Calamari
Celeste A. Chase
Howard A. Fischer
Daniel Michael