```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
SECURITIES AND EXCHANGE COMMISSION,    :

                    Plaintiff,         :

                    -v-                :

ERIC J. ARONSON; VINCENT J. BUONAURO,  :
JR.; ROBERT S. KONDRATICK; FREDRIC H.  :
AARON; PERMAPAVE INDUSTRIES, LLC;      :
PERMAPAVE USA CORP.; PERMAPAVE         :
DISTRIBUTIONS, INC.; VERIGREEN, LLC;   :
and INTERLINK-US-NETWORK, LTD.,        :
                                       :
                    Defendants,        :       11 Civ. 7033 (JSR)
                                       :
                    and                :          MEMORANDUM
                                       :            ORDER
CAROLINE ARONSON; DEBORAH BUONAURO;    :
DASH DEVELOPMENT, LLC; ARON HOLDINGS,  :
INC.; PERMAPAVE CONSTRUCTION CORP.;    :
DYMONCRETE INDUSTRIES, LLC; DYMON      :
ROCK LI, LLC; and LUMI-COAT, INC.,     :
                                       :
                    Relief Defendants. :
----------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Pending before the Court in the above-captioned case is the motion of the Securities and Exchange Commission ("SEC") for summary judgment against three defendants in this action. First, the SEC moves for summary judgment against defendant Eric Aronson on its claims against him for violations of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78o(a); violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) & (c); violations of section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); violations of Section 10(b)of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5,

as well as aiding and abetting the same under Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e); control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and aiding and abetting a violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-11 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-11. Second, the SEC moves for summary judgment against defendant Fredric Aaron ("Aaron") on its claims against him alleging that he aided and abetted violations of Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder), and Section 13(a) of the Exchange Act (and Rules 12b-20 and 13a-11 thereunder). Third, the SEC moves for summary judgment against relief defendant Caroline Aronson on its claim against her for unjust enrichment.

Frederic Aaron and Caroline Aronson timely filed their opposition papers to the pending motion; however, because of the late withdrawal of Eric Aronson's counsel from this case and Eric Aronson's subsequent pro se status, the Court extended the deadlines for him to oppose this motion. The Court heard oral argument on the SEC's motion as against Frederic Aaron and Caroline Aronson on February 26, 2013, and received supplemental briefing from those parties on March 1, 2013. Eventually, after several extensions of the deadline to file his opposition brief, Eric Aronson wrote to the Court on April 25, 2013, to withdraw his opposition to the motion. See ECF No. 132. After full

2

consideration of the parties' submissions and oral arguments, the Court grants in part and denies in part the SEC's motion.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail on summary judgment, the moving party must show that no genuine factual dispute exists, and in reviewing the motion, the Court must view all facts "in the light most favorable" to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Notwithstanding Eric Aronson's withdrawal of his opposition to the SEC's motion, the Court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001).

The facts relevant to this motion, which are either undisputed or, where disputed, taken most favorably to the defendants, are as follows. Between October 2006 and May 2007, Eric Aronson founded PermaPave Industries LLC ("PPI") and obtained the rights to sell PermaPave pavers in North and South America. The product is a porous paver composed of small pebbles glued together to permit rainwater to flow through. At the company's

3

founding, Aronson[1] was 100% owner, Managing Member, CEO and, President of PPI. SEC 56.1 ¶¶ 1, 21-24. Aronson also established, among other entities, PermaPave USA Corp. ("PPUSA") in 2006; Permapave Distributions, Inc. ("PPD") in 2008; Permeable Solutions, Inc. ("PSI") in 2008; and the Verigreen Group in 2009. SEC 56.1 ¶¶ 21, 27, 31.

From 2006 to 2010, Aronson solicited investors for promissory notes and use-of-funds agreements offered by several of the PermaPave entities. The interest on the promissory notes varied, but most provided for monthly rates of return ranging from 7.8% to 33.3% (i.e., 94% to 400% per annum) SEC 56.1 ¶¶ 59-60. Aronson told prospective investors that there was an unlimited number of buyers for the pavers, and that his company maintained a large backlog of purchase orders. He told investors that their funds would be used to purchase containers of pavers from Australia, and that, after the product was sold, Aronson and the investors would share the profits. Aronson further told investors that because he was a convicted felon, it was hard for him to obtain traditional bank financing to purchase the product for resale, so he had turned to friends, family, and friends of friends to raise money to finance the necessary wholesale purchase of pavers he needed to satisfy his outstanding purchase orders. SEC 56.1 ¶ 63. As one investor recounted:

---

[1] All references to "Aronson" hereinafter, unless otherwise noted, are to Eric Aronson.

> an investment made by me would be used solely to purchase
> containers from Australia. He described the investment as
> "risk-free" because the demand for the product was so
> huge . . . [that] even if a buyer cancels an order, there
> were three other buyers behind him ready to take his
> place. Aronson stated that my investment would earn 23.5%
> in one quarter . . . equivalent to half of the profits
> generated by the sale of a container. He also stated that
> . . . after [a] three month period, I would receive my
> principal back as well as the interest owed.

Id.

Aronson hired Adam Koral and Steven Moran to solicit

potential investors. At Aronson's direction, Koral searched for

investors interested in a "safe" investment, and Moran told

prospective noteholders that their funds would be used to purchase

containers of PermaPave pavers. Id. ¶¶ 64-65.

Apart from a pamphlet describing the pavers, Aronson

provided no further written documentation to prospective investors,

id. ¶ 66. A total of 140 investors purchased the notes and use-of-

funds agreements signed by Aronson, thirty of whom Aronson directly

solicited. Id. ¶¶ 61-62. Many had little or no investment

experience and drew heavily on their credit to purchase the

offerings. Id. ¶ 69.

In 2008, Aronson met with Charles Hecht, a securities

lawyer, and sought to retain him to assist with a securities

offering for PPI. After reviewing a copy of the promissory note and

listening to Aronson's statements about them, Hecht explained that

the notes were, as a matter of law, securities. Hecht further

explained that Aronson had violated the registration provisions of

the '33 Act and had likely violated the antifraud provisions of the '33 and '34 Acts. Aronson said that he understood Hecht's advise. SEC 56.1 ¶¶ 70-74.

At the same meeting, Hecht recommended that Aronson conduct a rescission offering that would give investors the right to get back their principal at a reasonable rate of interest or to convert their holdings into equity in either PPI or a parent to be formed. Hecht advised Aronson that an escrow account must be funded for the repayment of investors who declined to convert their investment. Moreover, Hecht advised Aronson that "[u]nder the federal securities law, as well as common law, if you make a promise to repay without having an intention at the time that you made the promise of making the repayment, that is considered fraud." SEC 56.1 ¶¶ 75-76.

Aronson acknowledged Hecht's advice, and agreed to deposit at least $15,000 per week into an escrow account. But Aronson never did so, leading Hecht to resign as his lawyer in June 2008. PPI retained Hecht again in August 2008 after agreeing to Hecht's condition that Aronson no longer have a management role or access to company bank accounts. Hecht resigned again in September 2008. SEC 56.1 ¶¶ 77-81.

After Hecht resigned, Aronson retained Aaron, formerly an attorney at the SEC, to provide "legal advice and representation for securities registration, contractual and transactional matters" to him, Verigreen, Inc., and Verigreen's subsidiaries and

6

affiliates. Id. ¶ 119.[2] On December 17, 2008, Lloyd Weinstein, a personal attorney for Aronson, sent Aaron an email that stated, "I believe there has been little done to address the debt of PermaPave (although I do not have actual knowledge), and that Eric [Aronson] needs an attorney to step in and address the same." In response to Weinstein, Aaron wrote, "I will create a form of Convertible Debenture which we will use to buy the promissory notes of the various creditors of PPI . . . . The plan is to get all the creditors in place and agreed to assign their PPI promissory notes for a combination of Convertible Debentures and common stock of PSI." SEC 56.1 ¶ 122.

Frederic Aaron then served as secretary and director of PPUSA from January 2009 to February 2011. Aaron filed incorporation papers for PSI in November 2008 and the same for Verigreen in December 2009. SEC 56.1 ¶¶ 30-31, 39. On January 23, 2009, the PSI Board of Directors passed resolutions that, among other things, authorized Aaron in his capacity as Secretary of PSI "to perform on behalf of this Corporation any and all such acts as they deem necessary or advisable in order to comply with any and all applicable laws." Id. ¶ 35.

Aaron worked out of the PermaPave entities' offices and had contact with investors, many of whom no longer trusted Aronson and were suspicious of securities offered by the PermaPave entities.

---

[2] There is some dispute between the parties about whether Aaron began his representation in October 2008 or January 2009. The issue is immaterial to the Court's resolution of this motion.

SEC 56.1 ¶¶ 99-101. On January 8, 2009, a group of PPI investors received a letter on Aaron's letterhead and signed by Aaron. It stated: "Eric would like the opportunity to discuss with you your investment (if you have not met with Eric already), and his offer to convert any promissory or other note you hold in PermaPave into a convertible debenture with PSI." The letter further stated: "If you decide to accept the offer, you will assign your promissory note to PSI and, in return, be paid 1% interest every month, with principal and accrued interest paid either in a lump sum in 24 months, or earlier if the company goes public or is bought by a third party." SEC 56.1 ¶ 123. Aaron drafted templates of the agreements that would eventually effect the exchange. Id. ¶ 141.

On January 19, 2009, several PPI noteholders met with Aronson and Aaron at the PermaPave office regarding the debentures offered in Aaron's letter. Aronson introduced Aaron as "formerly with the SEC in the Enforcement Division." Aronson told these noteholders that he was not liable for amounts owed on their notes, and Aaron provided explanations to investors as to why Aronson was not liable. SEC 56.1 ¶ 125-28. After a noteholder expressed concerns over PSI's ability to repay the debentures, Aronson and Aaron assured investors that PSI would fund an escrow account for the repayment of debentures. Aaron explained that the account would "be like a bond sinking fund." Id. ¶ 131.[3] When asked about the

---

[3] A "sinking bond fund" is a fund established to make periodic payments, and is designed to reduce or amortize a financial obligation by investing the cash invested in the fund. Ideally,

length of time until the debentures would be repaid, Aaron told investors: "Two years. That's it. Two years and then that's, that's when it's due and payable." SEC 56.1 ¶ 134.

The PSI debenture offering closed on January 30, 2009, and approximately 73 investors agreed to exchange their existing promissory notes or other investments in PSI for the convertible debenture. SEC 56.1 ¶¶ 135-136.[4] The promissory notes and use of funds agreements exchanged for the PSI debentures had a total face value of $4.7 million. The face value of the debentures, representing unpaid principal and accrued interest owed on the exchanged instruments, totaled $11,453,082. The debenture agreements, which were executed in or around January 2009, stated that they "shall be fully due and payable on January 15, 2011," paid interest at a rate of 1% per month. Id. ¶ 138. No money was ever repaid. Id. ¶ 140.

Notwithstanding Eric Aronson's representation to investors that there was a vibrant market for PermaPave products with an enormous backlog, all told, PPI, PPD, PPUSA, PSI, and the Verigreen Group paid a total of only approximately $400,000 for shipments of

---

such funds accumulate investment income sufficient to retire the bonds at their maturity. See SEC 56.1 ¶ 132.

[4] Aaron disputes that the offering closed on January 30, and his response to the SEC's Rule 56.1 statement suggests that investors were offered extra time to consult securities lawyers should they wish. See Aaron Resp. to Pl.'s R. 56.1 Statement, ECF No. 113 ("Aaron 56.1") at 50. The dispute is immaterial to the Court's resolution of this motion.

9

PermaPave pavers from wholesalers in Australia. SEC 56.1 ¶¶ 83-86.[5]
Approximately $1,385,816 was paid to Aronson from accounts
containing investor funds. Id. ¶ 95. At least $282,580 was paid to
Aaron from accounts containing investor funds. Id.

In June 2009, Aronson and Aaron purportedly negotiated a
sale of PPUSA to LendVestor, Ltd. ("LendVestor"). Aronson paid
LendVestor to finance its due diligence into his company. The two
entities signed a "letter of interest" on June 1, 2009, but
Rodriguez, the principal of LendVestor, told Aronson and Aaron that
LendVestor would not commit to the transaction until the PermaPave
Entities satisfied several conditions set forth in the June 1, 2009
letter. SEC 56.1 ¶¶ 158-60. Nevertheless, in late June 2009,
Aronson told investors that "the company is sold" and encouraged
them to sign "paperwork" to benefit from the purported sale. This
paperwork was an agreement converting debentures into shares in
PSI. SEC 56.1 ¶¶ 153-162. Aaron instructed an employee named
Restivo to telephone approximately 50 PSI debenture holders and ask
whether they would convert their debentures into PSI stock. Aaron
instructed Restivo to tell investors that, "in our opinion only, we
believe everything looks good." Id. ¶¶ 163-64. Restivo did not

---

[5] The SEC and Aaron widely diverge on the total amount of purchase
orders PermaPave entities received, with the SEC arguing that
evidence shows only $94,000 in orders and Aaron arguing that
PermaPave documents indicate more than $5.8 million in purchase
orders. See Aaron 56.1 at 31-32. The issue is immaterial to the
Court's resolution of this motion, and even if the Court accepted
the higher figure its rulings as to Eric Aronson and Aaron would be
the same.

disclose that PSI common stock is not traded on any public exchange, nor did he describe any restrictions on the shares. Id. ¶¶ 165-66.

Aaron drafted a template for the conversion agreement. The draft, and the final version, stated that the investor "will receive" a number of shares of PSI common stock, that PSI "represents and warrants that all such [shares] are duly authorized, validly issued, fully paid, and nonassessable," and that "[t]he [i]nvestor is an 'accredited investor' as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act." Id. ¶¶ 169-72.

Approximately 53 investors signed agreements converting their promissory notes, use of funds agreements, and debentures into shares of PSI common stock. None of them received the shares of PSI common stock specified in the conversion agreements. Id. ¶¶ 168-72.

Based upon records of PermaPave bank accounts, it appears that at least $26.2 million was raised through the sale of promissory notes and use of funds agreements, including approximately $24.6 million for the purported purpose of financing the purchase and shipment of containers of PermaPave pavers from Australia. SEC 56.1 ¶ 89. From March 19, 2007 through December 3, 2010, PermaPave entities made payments to investors totaling approximately $10.3 million, many of which were labeled as "interest payment[s]." Id. ¶ 90.

11

In May 2009, Aaron circulated an e-mail discussing a new corporate structure for the PermaPave entities that would make use of a holding company to "make it difficult (if not impossible) for the third party to sue VeriGreen and its members in the event there is a legal dispute over the operating subsidiary." SEC 56.1 ¶ 116.

On January 19, 2010, a debenture holder named Julie Holter exchanged several emails with Aaron. Holter stated, "I would like to know what ever happened to the account that was suppose[d] to have money in it to ensure that the debentures would be able to payed [sic] off next year. Was it ever funded? How will we be ensured that we will be payed [sic] off in time?" In reply, Aaron wrote that "we established an escrow for the repayment of debentures . . . ." Holter asked again, "[h]ow are we to be sure the money will be there?" but Aaron did not respond. SEC 56.1 ¶ 151.

On June 28, 2010, the PermaPave-related entity Verigreen Group acquired a majority stake in Interlink-US-Network, Ltd. ("IUSN"), which is registered with the SEC, through a reverse merger. SEC 56.1 ¶¶ 43-44. Notably, Aaron did not consult with PPI's twice-resigned attorney, Hecht, until June 2010. SEC 56.1 ¶ 147. On July 5, 2010, the Interlink Board of Directors appointed Aaron as a director and the Secretary of Interlink. Id. ¶ 49. On July 22, 2010, Aaron sent an email stating that "I have drafted a brief letter to lenders/investors discussing the acquisition of IUSN and what they will be receiving in the deal." Attached to the

email was a draft letter to investors which stated, among other things, "[i]f you executed a Conversion Agreement, you will be receiving stock in Interlink in exchange for your shares of Permeable Solutions, Inc. For every five shares of Permeable Solutions stock which you currently have, you will receive one share of Interlink stock." Weinstein, Aronson's other attorney, responded to this email to "express concern [about] releasing the name of the entity [i.e., Interlink] to those individuals who may look to cause harm (Holter). Is there a way to provide the detail without the name?" In response, Aaron stated that "[w]hat may make sense is to let the folks know that if they disparage the name IUSN or our other companies, they will be slitting their own wrists since the stock price will take a hit by going on scam victims or another website with the information." Id. ¶¶ 173-75.

The final letter sent to investors in the PermaPave entities read as follows:

As you know, you executed a Conversion Agreement with us last year. Because the original Convertible Debenture was based on an improper rate of interest, we recalculated all of the Convertible Debentures at 15% interest per annum. Accordingly, you will be receiving [a certain number of] shares of common stock of Interlink in exchange for your shares of Permeable Solutions, Inc. Under the Conversion Agreement, as adjusted for accrued interest at 15% per annum, you owned [a certain number of] shares of our stock. Based on a valuation of five shares of Permeable Solutions for one share of Interlink, we determined that you are entitled to receive [a certain number of] shares of Interlink stock. We have attached a Release to this letter. Please have the Release signed before a notary public and returned to us . . . .

13

Id. ¶ 178. The attached "release" purported to release all Permapave entities from "any and all claims and demands" Id. ¶ 179.

On September 30, 2010, two independent directors  of Interlink sent a letter to their fellow directors in which they noted several possible inaccuracies and inadequacies in Interlink's public disclosures. SEC 56.1 ¶ 199.

On October 11, 2010, Interlink issued Aaron 250,000 shares of its common stock, which held a market value of $212,500 on that date. There is no record of Aaron paying for the stock. SEC 56.1 ¶ 185. On October 22, 2010, an attorney representing several investors obtained a court order freezing the bank accounts of Aronson and the PermaPave entities. During this period, funds from the PermaPave entities were deposited into Aaron's attorney trust account, over which Aaron had exclusive control. The funds were used to pay PermaPave business expenses such as salaries and healthcare costs. SEC 56.1 ¶¶ 56-58.[6]

On October 20, 2010, LED Capital Corp. ("LED"), the Verigreen Group, and Interlink purportedly entered into an Investment Agreement pursuant to which LED would purchase 1.2 million Interlink shares at a price of $5 per share. SEC 56.1 ¶ 187. Notwithstanding the far more lucrative terms of Interlink's

---

[6] Aaron notes that the deposit of these funds began before the freeze order and disputes any connection between the freeze order and the use of Aaron's attorney trust account. See Aaron 56.1 at 19-20. The issue of the timing of the deposits or their putative connection to the freeze order is immaterial to the Court's resolution of this motion.

14

purported "Investment Agreement" with LED, on October 25, 2010, just five days after the investment agreement was signed, the Verigreen Group, Interlink, and Brett Hirsch entered into a Stock Purchase Agreement, which stated Hirsch's "desire to purchase 1,000,000 free-trading shares of [Interlink] Common Stock (the 'Purchase Share') from Seller in exchange for $64,516," id. ¶ 194, i.e., approxmately 6.5 cents per share.

On December 1, 2010, Aaron forwarded Interlink's CFO a copy of the Investment Agreement so that she could draft language for the Form 8-K. On December 14, 2010, Interlink issued a Form 8-K disclosure that, among other things, stated that Interlink and "LED Capital Corp [had] entered into a Memorandum of Understanding, whereby LED intends to invest $6,000,000 in Interlink." Just four days later, On December 18, 2010, Aaron sent Ronald Feldstein, a man who held himself out to be the President of LED, an e-mail indicating that "as discussed," the October 20 investment agreement between LED, IUSN, and Verigreen had been cancelled by agreement of the parties. See SEC 56.1 ¶¶ 199-208. Interlink never issued a corrective disclosure concerning the LED investment described in its earlier Form 8-K. Id. ¶ 209.

Against this backdrop of almost endless fraud, the Court turns first to the SEC's unopposed motion for summary judgment against Eric Aronson. Section 15(a)(1) of the Exchange Act makes it unlawful for a broker "to make use of . . . interstate commerce to

15

effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker is registered [with the SEC]." 15 U.S.C. §78o(a). Scienter is not an element of a Section 15(a) claim. SEC v. Martino, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003). A "broker" is broadly defined in the Exchange Act as "any person engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(b)(4), and in determining whether an individual counts as a broker under Section 15(a), courts have been guided by whether an alleged broker "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." Id.

The Court has no trouble concluding that Aronson qualifies as a "broker" for the purposes of Section 15(a) notwithstanding his earlier broker bar and lack of official association with a registered broker-dealer. As described above, Aronson directly offered promissory notes and use-of-funds agreements to at least 30 investors; pitched the notes and agreements to investors as "risk-free"; signed many of the notes and agreements; hired others to find and solicit prospective investors; and induced investors to convert debentures to shares, all while failing to register with the SEC. Consequently, the Court hereby grants summary judgment in

16

favor of the SEC as to liability for its Section 15(a) claim against Eric Aronson.

Similarly, the Court concludes on the undisputed factual record before it that the SEC is entitled to summary judgment on its claim that Aronson violated Sections 5(a) and 5(c) of the Securities Act. Those sections make it unlawful for a person to use interstate commerce to sell or to offer to sell a security for which a registration statement is not in effect (unless one of a number of here irrelevant exemptions applies[7]). See 15 U.S.C. §§ 77e(a) & (c). The Commission must show the following elements: "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998). Scienter is not an element of the offense. Since the SEC has come forward with competent and undisputed evidence that Eric Aronson offered and sold, using the mail, notes, use-of-funds agreements,

---

[7] Section 4(1) provides that the registration requirements of Section 5 do not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). The Second Circuit has noted that the exemption exists to permit the resale of already-issued securities, and that the term "issuer," as used in the statute's definition of underwriter, is given broad meaning to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." See SEC v. Cavanagh, 445 F.3d 105, 111 & 111 n. 14 (2d Cir. 2006). The Court finds that Eric Aronson falls within the statute's definition of "issuer," and, in any event, was a necessary participant in the offering and sale of PPI, PPD, PPUSA, and PSI securities by issuers he controlled. See SEC v.

and securities issued by PPI, PPUSA, PPD, and PSI without the requisite registration statements, the Court hereby grants summary judgment as to liability against Eric Aronson on the SEC's Section 5(a) and 5(c) claims.

This leaves the SEC's claims that Eric Aronson violated the antifraud provisions of Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act. As noted above, the SEC moves for summary judgment on its claims that Eric Aronson committed primary violations, that he is liable for the violations of others as a "control person" of them, and that he aided and abetted the primary violations of others. The Court discusses each of the claims sounding in the antifraud provisions of the securities laws in turn.

Section 10(b) of the Exchange Act, as implemented by Rule 10b-5 thereunder, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to establish its Section 10(b) and Rule 10b-5 claims against Eric Aronson, the SEC must show that he "(1) made a material misrepresentation or material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192

Verdiramo, 890 F.Supp.2d 257, 271 (S.D.N.Y. 2011).

F.3d 295, 308 (2d Cir. 1999). With respect to the alleged
misconduct at issue in this case "[e]ssentially the same elements
[as those required to show a violation of section 10(b) and Rule
10b-5] are required under Section 17(a)(1)-(3) in connection with
the offer or sale of a security." Monarch Funding, 192 F.3d at
308.[8]

        The Court finds that the SEC has met its burden as to each
of the elements of its Section 10(b), Rule 10b-5, and Section 17(a)
claims. As to the first element, the Court concludes that Eric
Aronson made numerous material misstatements in selling PermaPave
notes and use-of-funds agreements as "risk free" investments, in
stating that the funds secured by the use-of-funds agreements would
be used to purchase pavers, in stating that an escrow account would
be funded to pay for PSI debentures, and in telling investors that
they should convert their debentures into PSI Shares because "the
company is sold." Such statements are "so obviously important to
the investor, that reasonable minds cannot differ on the question
of materiality," and are thus material as a matter of law. See SEC
v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978).

        As to the second element, scienter, the Court notes that the
requisite state of mind for these claims is an intent "to deceive,

---

[8] However, as this Court has already had occasion to note, the
analogy is not precise. Notably, Section 17(a)(2), unlike Rule 10b-
5, prohibits a defendant from obtaining money "by means of" an
untrue statement. Thus a defendant "may be held liable under
17(a)(2), though not under 10b-5, if, he obtains money or property
by use of a false statement, whether prepared by himself or by
another." See SEC v. Stoker, 865 F.Supp.2d 457, 465 (S.D.N.Y.

manipulate, or defraud," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). It is also the law of this Circuit that "[i]n addition to intent, recklessness is a sufficiently culpable mental state for securities fraud," which means "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, Local 134 IBEW v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

        The SEC has carried its burden on this motion to show the absence of a genuine issue of material fact regarding Eric Aronson's scienter with respect to his primary violations of the antifraud statutes. At minimum, Aronson's signing of the use-of-funds agreements, his continuing to sell PPI promissory notes after Hecht advised him that the notes violated the registration provisions of the securities laws, his diversion of investor funds to himself rather than to purchase pavers, and his promise to fund an escrow account to repay the debentures, all demonstrate that Eric Aronson was, at a minimum, totally reckless in making misstatements to investors. Furthermore, it is undisputed that Eric Aronson acknowledged Hecht's advice, offered early on in the fraud, that "[u]nder the federal securities law, . . . if you make a promise to repay without having an intention at the time that you

2012).

made the promise of making the repayment that is considered fraud."
SEC 56.1 ¶ 76.[9]

As to the third element, the Court concludes as a matter of
law that the above-stated material misstatements were made in
connection with the sale of securities. The economic reality of the
use-of-funds agreements, the debentures, and the conversion
agreements is that all sought the use of money of others on the
promise of profits. See generally SEC v. W.J. Howey Co., 328 U.S.
293, 299 (1946).

Because the Court concludes that the SEC has carried its
burden on all of the requisite elements for its primary antifraud
claims, and since it concludes that on the competent evidence
produced by the SEC on this motion no reasonable juror could return
a verdict in Eric Aronson's favor, the Court hereby grants summary
judgment as to liability in the SEC's favor on its Section 10(b),
Rule 10b-5, and Section 17(a) claims against Eric Aronson.

While the Court grants the SEC's motion with respect to the
Eric Aronson's primary violations of Section 10(b), Rule 10b-5, and
Section 17(a), it notes that the SEC also seeks summary judgment
for its "control person liability" claim based upon essentially the
same misconduct. Section 20(a) of the Exchange Act, 15 U.S.C. §
78t(a), makes individuals liable for the primary violations of
others whom they "control." To prove Eric Aronson's liability on a
control-person theory, the SEC must demonstrate: (1) a primary

---

[9] Except were otherwise noted, all citations are to undisputed

violation by a controlled person; (2) control of the primary

violator by the defendant; and (3) "that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's

fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108

(2d Cir. 2007). Here, the primary violations by controlled persons

that form the basis of the SEC's control-person claim against Eric

Aronson are the same as those that constitute the primary

violations committed by Eric Aronson himself. To proceed on this

theory, the SEC attempts to employ the legal fiction of imputing

Eric Aronson's misconduct (and his scienter) to PPI, PPUSA, and PPD

in order to establish these entities' own primary violations, and

then "double-back" by way of control-person liability to hold

Aronson separately liable under Section 20(a) of the Exchange Act.

However, because there is no "alternative theory where defendants

are not primary violators and yet can still be held liable on a

secondary violation theory through controlling [another]," the

Court finds that this doubling-back is inappropriate and that Eric

Aronson's primary violations will not separately support a control-

person claim as well. See City of Pontiac General Emps.' Retirement

Sys. v. Lockheed Martin Corp., 875 F.Supp.2d 359, 375 (S.D.N.Y.

2012). Thus the SEC's motion for summary judgment on its control

person claims is denied.

The same logic compels the denial of the SEC's motion

regarding its claim against Eric Aronson for secondary aiding-and-

portions of the SEC's Rule 56.1 statement.

abetting liability for the PermaPave entities' alleged primary violations of Section 10(b) and Rule 10b-5 thereunder: the misconduct underlying PermaPave's alleged primary violations are identical to those for which the Court holds Eric Aronson primarily liable under the antifraud securities statutes. Consequently, the Court denies the SEC's motion for summary judgment on its aiding-and-abetting claims against Eric Aronson that relate to alleged primary violations by the PermaPave entities.

Turning to the final claim against Eric Aronson, the SEC argues that it is entitled to summary judgment on the claim that Eric Aronson aided and abetted the alleged primary violations by Interlink of its reporting requirements under Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. To succeed on its aiding and abetting claim, the SEC must prove "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012).

Because the Court finds the second of these elements dispositive, it does not dwell on the others. For the SEC's moving papers are committed to the view that "a reckless state of mind now is plainly sufficient to impose liability on an aider and abettor under Section 20(e)." Pl.'s Mem. in Supp. of Mot. for Summ. J. at

23

28 (quoting SEC v. Aragon Capital Advisors, LLC, No. 07 Civ. 919, 2011 WL 3278907, at *16 (S.D.N.Y. July 26, 2011)). The theory that a showing of recklessness is sufficient to prove the requisite scienter for an aiding-and-abetting claim runs throughout the SEC's motion practice. See, e.g., Pl.'s Mem. in Supp. of Mot. for Summ. J. at 29-31 (arguing that Eric Aronson "knew or was reckless in not knowing" about the PermaPave entities' fraud and that "[e]ven if Aronson somehow did not know" of the alleged Interlink misstatements it was reckless not to "verify the bona fides" of the investment agreement); see also id. at 33-35, 40 (arguing that co-defendant Aaron recklessly breached a duty to investigate and a duty to disclose).

The SEC's either/or mode of arguing knowledge for its aiding and abetting claims -- i.e., arguing that "even if" there was no actual knowledge there was recklessness -- requires the Court to determine, as a threshold matter, whether a showing of recklessness is sufficient to support an aiding-and-abetting claim.[10] Indeed, co-defendant Aaron's principal opposition to the SEC's motion is that the SEC has misstated the standard of liability for aiding-and-abetting claims applicable to the alleged misconduct at issue in this case. As Aaron's brief correctly notes, before the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") took

---

[10] Since, as the Court has already noted, a showing of recklessness is sufficient to prove scienter for a primary violation of the antifraud provisions of the securities laws, the SEC's commitment to a recklessness theory for its aiding-and-abetting claims does not disturb the Court's rulings as to the SEC's primary violation

effect on July 21, 2010, Section 20(e) of the Exchange Act provided only that "any person that knowingly provides substantial assistance" could be held liable as an aider-and-abettor. See 15 U.S.C. §78t (2009). Dodd-Frank amended that provision to impose aiding-and-abetting liability on "any person that knowingly or recklessly provides substantial assistance." See 15 U.S.C. §78t (2012) (emphasis supplied). Aaron argues that this change reveals that prior to Dodd-Frank, a Section 20(e) violation required a showing of actual knowledge, and that the SEC's attempt to read "recklessness" into the statute that applies to the misconduct alleged in the Complaint attempts to improperly and retroactively apply the Dodd-Frank amendments. See Aaron Mem. in Opp. at 11. In reply, the SEC vigorously argues that "[r]ecklessness has been, both before and after the enactment of Dodd-Frank, sufficient to demonstrate knowledge in an aiding and abetting claim where . . . the defendant has a duty of disclosure." Reply Mem. at 1 (citing SEC v. Elecs., Warehouse, Inc., 689 F. Supp. 53, 60 (D. Conn. 1988)).

The parties' briefing on this issue blithely ignores that it is a long-contested issue about which courts in this District have disagreed. Contrary to co-defendant Aaron's briefing, the inclusion of "recklessness" as part of the Dodd-Frank amendments does not, on its own, resolve the issue: the addition of "recklessness" to the statutory text is as consistent with the view that Dodd-Frank

claims against Eric Aronson.

25

recognized an already extant judicial interpretation of Section 20(e)'s "knowledge" element as it is consistent with the view that Congress altered or expanded the prevailing legal standard. By contrast, however, the SEC's contention that Section 20(e) always embraced recklessness in addition to actual knowledge ignores much prior case law. Indeed, even before Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), the law "was not uniform on the issue of what constituted the requisite scienter for aiding and abetting liability." SEC v. KPMG LLP, 412 F. Supp. 2d 349, 383 (S.D.N.Y. 2006). And while the Supreme Court granted certiorari on this very issue in Central Bank, in the end it did not reach the merits of the issue after it rejected private aiding-and-abetting outright. See id. Furthermore, in the wake of Central Bank and the passage of Section 20(e) as part of the Private Securities Litigation Reform Act ("PSLRA"), courts in this District have taken opposite positions on whether the "knowledge" element of the pre-Dodd-Frank cause of action under Section 20(e) includes recklessness. Compare KPMG, 412 F.Supp.2d at 382 (holding that Section 20(e) does not includes recklessness) and SEC v. Espuelas, 579 F. Supp. 2d 461, 470-71 (S.D.N.Y. 2008) (same) with SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) and SEC v. Lybrand, 200 F. Supp. 2d 384, 400 (S.D.N.Y. 2002).

Principally for the reasons given by Judge Cote in KPMG, and given the nature of the misconduct and duties alleged in this case, the Court concludes that to meet its burden on its aiding-and-

26

abetting claims against Eric Aronson (and, as discussed below, co-defendant Aaron), the SEC must prove that the defendant had actual knowledge of the primary violation. The cases on which the SEC ultimately relies not only predate Section 20(e) and Central Bank, but also neglect the Second Circuit's admonition that "[i]f there is no fiduciary duty . . . the scienter requirement increases, so that [a plaintiff] need[s] to show that [the defendant] acted with actual intent." See Ross v. Bolton, 904 F. 2d 819, 824 (2d Cir. 1990). Moreover, the conclusion that an aiding-and-abetting claim under the pre-Dodd-Frank version of Section 20(e) requires a showing of actual knowledge is supported both by the legislative history of Section 20(e) and the restrictive treatment that pre-PSLRA cases gave to holding non-fiduciaries liable on a showing of a merely reckless state of mind. See generally KPMG, 412 F. Supp. 2d at 383 (discussing the legislative history, pre-Section 20(e) case law, and the general view that if the knowledge requirement may be "relaxed" to embrace recklessness, there must usually be some fiduciary relationship between the plaintiff and the alleged aider-and-abettor).[11]

---

[11] There is some authority in this District for the proposition that "recklessness satisfies the scienter requirement where the plaintiffs were third parties whose reliance on the defendant's fraudulent conduct was foreseeable or where the defendant owed a duty of disclosure to the defrauded party," Lybrand, 200 F. Supp. 2d at 400. The Court declines to read so broad a standard of "recklessness" into the knowledge element of Section 20(e) given the prevailing rule that "where there is no fiduciary relationship, the scienter requirement scales upward -- the assistance rendered must be knowing and substantial." Id. As Judge Cote noted in KPMG, most of the cases supporting the "foreseeable reliance" exception

The Court's conclusion that, on the facts of this case, the SEC must show actual knowledge to prove its aiding-and-abetting claim requires the denial of the SEC's motion on its Interlink-related aiding-and-abetting claim against Eric Aronson. The SEC's moving papers emphasize what appears to be an obvious violation by Interlink of its reporting requirements under Section 13(a) of the Exchange Act, insofar as Interlink stated that LED had agreed to invest funds equivalent to 2,000% of Interlink's total assets in the company. The SEC argues that in light of the the fact that the "dubious" Investment Agreement contemplated a "gross overpayment," the Court should find that Eric Aronson possessed the requisite knowledge to hold him liable as an aider-and-abettor because "[e]ven if Aronson somehow did not know that there was no agreement or understanding with LED, his failure to make the slightest attempt to verify the bona fides of the Investment Agreement he negotiated was reckless." Pl.'s Mem. in Supp. at 30-31. There is no express argument in the SEC's moving papers that the undisputed factual record before the Court permits an inference of Eric Aronson's actual knowledge on this point, nor does the Court discern one that would be sufficient to satisfy the standard imposed on summary judgment. Thus the issue remains an open question of fact for the jury.[12] The Court therefore denies the

find the existence of a fiduciary relationship. See KPMG, 412 F. Supp. 2d at 384.

[12] Perhaps appreciating that arguing recklessness to satisfy the knowledge requirement of the pre-Dodd-Frank Section 20(e), the SEC

SEC's motion for summary judgment on its aiding-and-abetting claims against Eric Aronson.

For substantially the same reasons, the Court denies the SEC's motion against Aaron with respect to Aaron's alleged aiding and abetting of both the PermaPave fraud and Interlink's allegedly false Form 8-K disclosures. Indeed, the SEC relies almost exclusively on a "recklessness" standard to prove its aiding-and-abetting claims against Aaron, at least for summary judgment purposes. See, e.g., Pl's Mem. in Supp. at 34 (arguing that Aaron's scienter for the PermaPave-related aiding-and-abetting claims is established by Aaron's "reckless disregard," evinced by "a showing that he breached both a duty to investigate and a duty to disclose") and id. at 40 (arguing in relation to the Interlink-related aiding-and-abetting claims that "[n]ot only was Aaron reckless, but there is also strong circumstantial evidence . . . that he knew the Form 8-K was false"). But the SEC's admittedly circumstantial evidence of "suspicious event[s]" and Aaron's failure to investigate the "doubtful," are not, when viewed in the light most favorable to Aaron, sufficient to entitle the SEC to

---

also invites the Court to draw an adverse inference from Eric Aronson and Aaron's invocation of their Fifth Amendments rights in connection with document requests and depositions in this action. See Pl.'s Mem. in Supp. of Summ. J. at 18-19. However, such an adverse inference will not transmute an argument premised upon recklessness into an argument about actual knowledge. In any event, while "a *jury* might draw such inferences, . . . [the Court is] required at summary judgment to draw all inferences in favor of the non-moving party." Stichting Ter Berhartiging Van de Belangen Van Oudaaneelhouders In Het Kapitaal Van Saybolt Int'l v. Schreiber, 407 F.3d 34, 55 (2d Cir. 2005).

summary judgment on the posture of this motion. Dependent as the SEC's arguments are upon a recklessness standard for aiding-and-abetting knowledge, the issue of whether Aaron acted with the requisite actual knowledge of the primary violations of either PermaPave or Interlink remains a question of fact for the jury.[13] The Court thus denies the SEC's motion for summary judgment against Aaron.

In light of the unresolved aiding-and-abetting claims against Eric Aronson and Aaron, the Court does not reach the issue of appropriate relief. That determination is best made after the full extent of both co-defendants' liability is established.

Turning finally to the SEC's motion against relief defendant Caroline Aronson, the Court notes that it may order disgorgement against a relief defendant who is not accused of wrongdoing in a securities enforcement action provided that the defendant: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998). The SEC concedes that Caroline Aronson played no part in the PermaPave fraud, but argues in its moving papers that "net payments totaling $760,863 were made to her from the accounts containing investor funds." Pl's Mem. in Supp. at 47.  Because the Court has

---

[13] At oral argument on this motion, counsel for the SEC offered new, and unbriefed, theories of Aaron's aiding-and-abetting liability for other primary violations arising under Section 13(a) and Rule 10b-5. The Court will not consider legal theories raised for the first time at oral argument where those allegations are not raised in the initial Complaint. See Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012).

30

granted the SEC's motion as to liability against Eric Aronson for his primary violations of Section 10(b) and Rule 10b-5 in connection with the PermaPave fraud, it is appropriate to order disgorgement of Caroline Aronson's ill-gotten gains from that fraud over which she has no legitimate claim. Indeed, the principal dispute between the parties is the appropriate amount of disgorgement.

The SEC initially moved for disgorgement in the amount of $760,863, plus pre-judgment interest, based upon amounts transferred from accounts containing PermaPave investors' money to various bank accounts connected to the Aronsons. The SEC argued that the entirety of those transfers represent ill-gotten gains and are subject to disgorgement. In her opposition, Caroline Aronson argues that she did not receive or benefit from $539,600 of those transfers, and that the SEC's evidence in support of that portion of the total amount includes transfers to someone named Tomas Bartos, whom "she does not know," and checks or withdrawal tickets that bear her name but about which she had no knowledge. See Caroline Aronson's Mem. in Opp. to Summ. J. at 8. In short, Caroline Aronson argues she, too, was "a victim in this case," and that $539,600 of the SEC's requested disgorgement figure represents either amounts moving through accounts over which she had no control or money that she never received. With regard to the remaining $296,262, Caroline Aronson argues that the amount should not be subject to disgorgement because the assets and accounts to

31

which this figure relates were either controlled by Eric Aronson,
exclusively used by him, or, in the case of the Aronsons'
residence, jointly owned by the two of them.

In reply, the SEC modified its disgorgement claim to
exclude, for purposes of this motion, the amounts that Caroline
Aronson specifically here contests. The SEC answers Caroline
Aronson's more general opposition to disgorgement of the remaining
$296,262 by noting that the Commission's burden is to establish a
receipt of ill-gotten funds without a legitimate claim thereto. The
applicable test for disgorgement contains no requirement of actual
use or enjoyment of the assets, nor is there a requirement that one
who receives ill-gotten gains know of the receipt of the gains. See
Cavanagh, 155 F.3d at 137. The Court therefore concludes that
Caroline Aronson's protestations that she was not aware of her
receipt of ill-gotten gains from the PermaPave fraud, and her claim
that she did not use, for example, an automobile registered in her
name, do not affect the appropriateness of disgorgement. See id.
With respect to the Aronsons' residence, the Court notes that
Caroline Aronson's own evidence submitted in opposition to this
motion demonstrates that the house is her sole asset and the
mortgage her sole liability, and, conclusory assertions
notwithstanding, she raises no triable issue of fact as to her
ownership of the property. See Decl. of Dominick Gullo, ECF No.
104, Ex. E.

32

However, based upon her professed ignorance of the PermaPave fraud, which the Court has no reason to doubt, and having balanced the need to compensate the wronged party for actual damages, considerations of fairness, and the remedial purpose of the statute, see SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996), the Court declines to impose prejudgment interest in calculating the appropriate amount of disgorgement against Caroline Aronson. This determination is without prejudice to the imposition of such relief against the remaining defendants in future proceedings in this case. Consequently, the Court grants in part the SEC's motion for summary judgment as to Caroline Aronson and hereby orders disgorgement from her in a total amount of $296,262.

For the foregoing reasons, the Court grants the SEC's motion for summary judgment against Eric Aronson as to liability for its claims against him for violations of Section 15(a) of the Exchange Act, violations of Sections 5(a) and 5(c) of the Securities Act, violations of section 17(a) of the Securities Act, and violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Court denies the SEC's motion as to liability for its aiding-and-abetting and control-person claims against Eric Aronson, and its aiding-and-abetting claims against Aaron. Finally, the Court grants in part the SEC's motion for summary judgment against Caroline Aronson, ordering disgorgement in the amount of $296,262.[14] Counsel

---

[14] The SEC is directed to work out a reasonable schedule for this

for the SEC and for Aronson should jointly telephone the Court within three business days of the filing of this Memorandum Order to schedule a trial date.

     SO ORDERED.

                                            _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
       August 6, 2013

---

payment. If no such agreement can be reached, the payment must be paid in full by December 31, 2013.